# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANA GRAY,<br><br>       Plaintiff,<br><br>   v.<br><br>A. KHOO, et al.,<br><br>       Defendants. | Case No. 1:20-cv-01047-ADA-SAB (PC)<br><br>FINDINGS AND RECOMMENDATIONS REGARDING PARTIES' MOTIONS FOR SUMMARY JUDGMENT, AND PLAINTIFF'S RELATED MOTIONS<br><br>(ECF Nos. 105, 125, 136, 137, 138, 139, 140.) |

Plaintiff Dana Gray is proceeding pro se and in forma pauperis in this civil rights action filed pursuant to 42 U.S.C. § 1983.

Currently before the Court is Plaintiff's motion for summary judgment; Defendants' motion for summary; and Plaintiff's motion to dismiss Defendants' counterclaim, motion for dismissal of declaration of Defendants' expert witness, motion for dismissal of lodging Plaintiff's deposition transcript, motion for judgment as a matter of law, and motion to strike "any and all statements, paragraphs, and exhibits from Defendant's motion. (ECF Nos. 105, 125, 136, 137, 138, 139, 140.)

## I.

## RELEVANT PROCEDURAL BACKGROUND

This action is proceeding against Defendants Doctor Mitchell, Doctor Ola, and Doctor Song for deliberate indifference to a serious medical need.[1]

Defendants filed an answer to the complaint on April 26, 2021. (ECF No. 37.)

After an unsuccessful settlement conference, the Court issued the discovery and scheduling on September 1, 2021. (ECF No. 54.)

---

[1] Defendants Singh and Showalter, were dismissed from the cate. (ECF Nos. 63, 78.)

1       Plaintiff filed a motion for summary judgment on July 11, 2022.  (ECF No. 105.)  On

2  July 26, 2022, Plaintiff filed a statement of undisputed facts in support of her motion for

3  summary judgment.  (ECF No. 113.)

4       On October 11, 2022, Defendants filed a motion for summary judgment and opposition to

5  Plaintiff's motion for summary judgment.  (ECF Nos. 125, 126.)  Plaintiff filed a reply to

6  Defendants' opposition on November 4, 2022, along with statements of undisputed facts.  (ECF

7  Nos. 132, 133, 134.)

8       On November 10, 2022, Plaintiff filed a motion to dismiss Defendants' counterclaim,

9  motion for dismissal of declaration of Defendants' expert witness, motion for dismissal of

10  lodging Plaintiff's deposition transcript, motion for judgment as a matter of law, and motion to

11  strike "any and all statements, paragraphs, and exhibits from Defendant's motion.  (ECF Nos.

12  136, 137, 138, 139, 140.)  Defendants filed an opposition to Plaintiff's on December 1, 2022.

13  (ECF No. 142.)  After receiving three extensions of time, Plaintiff filed a reply on February 27,

14  2023.  (ECF No. 154.)

**II.**

**LEGAL STANDARD**

**A.**    **Summary Judgment Standard**

18       Any party may move for summary judgment, and the Court shall grant summary

19  judgment if the movant shows that there is no genuine dispute as to any material fact and the

20  movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a) (quotation marks

21  omitted); Washington Mut. Inc. v. U.S., 636 F.3d 1207, 1216 (9th Cir. 2011).  Each party's

22  position, whether it be that a fact is disputed or undisputed, must be supported by (1) citing to

23  particular parts of materials in the record, including but not limited to depositions, documents,

24  declarations, or discovery; or (2) showing that the materials cited do not establish the presence or

25  absence of a genuine dispute or that the opposing party cannot produce admissible evidence to

26  support the fact.  Fed. R. Civ. P. 56(c)(1) (quotation marks omitted).  The Court may consider

27  other materials in the record not cited to by the parties, but it is not required to do so.  Fed. R.

28

1  Civ. P. 56(c)(3); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir.
2  2001); accord Simmons v. Navajo Cnty., Ariz., 609 F.3d 1011, 1017 (9th Cir. 2010).

3  In judging the evidence at the summary judgment stage, the Court does not make
4  credibility determinations or weigh conflicting evidence, Soremekun v. Thrifty Payless, Inc., 509
5  F.3d 978, 984 (9th Cir. 2007) (quotation marks and citation omitted), and it must draw all
6  inferences in the light most favorable to the nonmoving party and determine whether a genuine
7  issue of material fact precludes entry of judgment, Comite de Jornaleros de Redondo Beach v.
8  City of Redondo Beach, 657 F.3d 936, 942 (9th Cir. 2011) (quotation marks and citation
9  omitted).

10  In reviewing cross-motions for summary judgment, a court is required to consider each
11  motion on its own merits. Fair Hous. Council of Riverside Cty., Inc. v. Riverside Two, 249 F.3d
12  1132, 1136 (9th Cir. 2001). "In fulfilling its duty to review each cross-motion separately, the
13  court must review the evidence submitted in support of each cross-motion." Id.

14  In arriving at these Findings and Recommendations, the Court carefully reviewed and
15  considered all arguments, points and authorities, declarations, exhibits, statements of undisputed
16  facts and responses thereto, if any, objections, and other papers filed by the parties. Omission of
17  reference to an argument, document, paper, or objection is not to be construed to the effect that
18  this Court did not consider the argument, document, paper, or objection. This Court thoroughly
19  reviewed and considered the evidence it deemed admissible, material, and appropriate.

20  **III.**

21  **DISCUSSION**

22  **A.    Summary of Plaintiff's Complaint**

23  On January 4, 2018, Plaintiff had a 4 level lumbar fusion by a neurosurgeon, Dr. M.
24  Senegor.  (Sec. Am. Compl. ("SAC"), 6, ECF No. 24.)  On January 17, 2018, Showalter noted
25  that the primary care provider is responsible to determine diagnostic tests and recommendations
26  by specialists.  (Id.)  Plaintiff had a follow up with Dr. Senegor, her Neurontin was increased and
27  was to be continued.  (Id.)  Plaintiff was completely off opioids by March 9, 2018.   (Id.)
28  ///

On March 14, 2018, plaintiff had a lumbar spine x-ray that showed mild nonspecific lucency around the L4-5 screws.  (Id.)  Plaintiff had a follow up with Dr. Senegor on July 2, 2018, and had "compression stress" type pain in her lumbar spine.  (Id.)

In August 2018, Plaintiff told Khoo that she was having left hip pain, paraspinal and left hip tenderness, and bilateral numbness on the soles of her feet with activity.  (Id.)  Plaintiff had an x-ray on September 7, 2018, that showed "question of right S1 screw lucency raising possibility of loosening.  (Id.)  Khoo discussed the x-ray with Plaintiff on September 17, 2018, and submitted a request for evaluation with a neurosurgeon.  (Id.)

On October 15, 2018, Plaintiff had a follow up with Dr. Senegor who told her that the September 7, 2018 x-ray showed bone resorption at the right S1 screw and failed L5-S1 fusion which were likely to be the cause of her lower back pain and recommended that she return in one year with a follow up CT scan.  (Id. at 6-7.)  She was to not sit or stand for over one hour; not bend, stoop, or twist excessively; and if there was no improvement within the next three to six months she would need revision surgery.  (Id. at 7.)  Plaintiff filed a grievance requesting a follow up with a neurosurgeon that was partially granted.  (Id.)  She was to continue Neurontin, provided orthotics and an eggcrate mattress.  (Id.)

Plaintiff had a CT scan of the lumbar spine on November 15, 2018, that did not show screw lucency or a failure of the fusion.  (Id.)

On December 19, 2018, Plaintiff had a lumbar spine x-ray which did not show any loose screws or a failed fusion.  (Id.)

Plaintiff was seen by Dr. Senegor for a one year post-operative appointment on January 7, 2019.  (Id.)  Dr. Senegor recommended that pain management be reinstated and that Plaintiff have revision surgery in two stages for the failed fusion and S1 screw replacement.  (Id.)

Plaintiff saw Khoo on January 10, 2019, complaining of increased lower back pain and insomnia and requested surgery and reinstitution of opiate pain management.  (Id.)  Khoo submitted a request for medical services for Plaintiff to receive revision surgery and ordered morphine two times per day and at bedtime for severe pain for fourteen days, but denied opiate pain management because Plaintiff was on Gabapentin and Naproxen.  (Id.)  Khoo did not list

the InterQual criteria on the request or in his progress notes.  (Id.)

On January 15, 2019, the pain management committee discussed the InterQual criteria. (Id.)

On January 16, 2019, Plaintiff was seen by Dr. Glass in mental health for a pain management evaluation, coping mechanisms, and medical allergies.  (Id.)

On January 17, 18, and 19, 2019, LVNs recorded observations of Plaintiff's pain and activities of daily living without interviewing her or doing a physical assessment of her pain levels.  (Id.)

On January 22, 2019, a pain management note was entered with no interview or physical assessment.  (Id.)

On January 22, 2019, Antinello interviewed Plaintiff for her inmate appeal.   (Id.) Antinello noted the September 7, 2018 and  December 19, 2018 x-rays and the November 15, 2018 CT scan finding "no conclusive evidence of loose or broken hardware."  (Id.)  Antinello evaluated Interqual criteria and found that Plaintiff did not meet any of the InterQual criteria, relying on the observations of LVNs although Plaintiff met 3 of the 6 criteria.  (Id. at 7-8.)

On January 23, 2019, Khoo discontinued morphine.  (Id. at 8.)

On January 29, 2019, Khoo submitted a request for services seeking revision surgery that did not address the InterQual criteria.   (Id.)

On February 13, 2019, Plaintiff saw Khoo for lower back pain and nerve pain in the right leg and was told that revision surgery had been denied but that he would discuss the InterQual criteria with Singh and present the request at the MAR meeting, but did not do an InterQual criteria examination.  (Id.)

On February 21, 2019, the MAR committee was presented with the request for a repeat lumbar spine surgery/fusion and the committee reviewed the November 15, 2018 CT scan that did not document the screw lucency, and did not inquire into the discrepancy or order a re-read and there was no mention of the InterQual criteria.  (Id.)

On March 5, 2019, Khoo told Plaintiff that the request for services was denied because Defendant Mitchell and Singh said the screw was not falling out.  (Id.)  Khoo was to inquire

about a follow up with a neurosurgeon.  (Id.)

On March 19, 2019, Singh interviewed Plaintiff for her inmate grievance about Antinello and the first revision denial.  (Id.)  Plaintiff informed Singh that the November 15, 2018 CT scan failed to mention the screw lucency found in the September 7, 2018 lumbar spine x-ray.  (Id.)  Singh told Plaintiff that she needed a second opinion and that if the second opinion agreed with Dr. Senegor that she needed revision surgery she would definitely receive it.  (Id.)  Singh ordered a lumbar spine x-ray.  (Id.)  Plaintiff saw Khoo on this date to have her pain medication changed due to having a severe reaction to Lyrica and they discussed the second opinion by a neurosurgeon.  (Id.)

On March 20, 2019, the request for a second opinion was approved and Plaintiff was to see Dr. Taggard.  (Id.)  On March 26, 2019, an addendum was added to Plaintiff's November 15, 2018 CT scan which confirmed the right S1 screw lucency.  (Id.)

Plaintiff had a lumbar spine x-ray that showed a fracture of the S1 screw and potential loose right S1 screw.  (Id. at 9.)

On April 5, 2019, Plaintiff saw Singh to discuss the second opinion by the neurosurgeon, the March 29, 2019 lumbar spine x-ray, and her inmate appeal.  (Id.)  Plaintiff was still taking Gabapentin.  (Id.)

On April 15, 2019, Khoo reviewed the lumbar spine x-ray showing the fractured screw and they discussed Plaintiff's increased pain and burning from the left buttocks to the sole of the foot.  (Id.)

Plaintiff received a second neurosurgery consult on June 12, 2019, and a CT scan was ordered.  (Id.)

On June 18, 2019, Khoo ordered a CT scan and discussed the InterQual criteria finding that Plaintiff now met all the criteria due to the fractured screw.  (Id.)

Plaintiff had a CT scan on July 11, 2019, that showed a left SI screw fracture and abnormal lucency around the right screw.  (Id.)

Plaintiff had a telemed appointment on July 30, 2019, and Dr. Taylor noted that Plaintiff was able to hop on and off the exam table although Plaintiff was assisted by nursing.  (Id.)

On August 1, 2019, Defendant Mitchell told Plaintiff that Gabapentin was discontinued statewide and to have Khoo present it to the pain management committee to see if it could be continued for her.  (Id.)

On August 22, 2019, Khoo told Plaintiff that Gabapentin was to be tapered per Defendant Mitchell.  (Id.)

On August 28, 2019, Plaintiff was seen by Dr. Taggard who recommended revision surgery, ordered 10 days of Tramadol pre-op, and scheduled surgery.  (Id.)

On September 6, 2019, Khoo submitted a request for services for revision surgery leaving the InterQual criteria off the request.  (Id.)  On September 10, 2019, Defendant Mitchell, Singh, and Showalter failed to ensure that the InterQual criteria was on the request for services prior to submitting it for approval.  (Id.)

On October 1, 2019, Defendant Song denied Plaintiff's appeal because of the July 30, 2019 note that Plaintiff could hop on and off the examination table.  (Id.)

On November 1, 2019, Plaintiff discussed the fact that InterQual criteria was not included on the request for services with Defendant Mitchell.  (Id.)  Defendant Mitchell told Plaintiff to lose weight and then he would reconsider the radiology study to see if the lumbar hardware was loosening.  (Id.)

On December 27, 2019, Plaintiff saw Khoo for the denial of opioids by the pain management committee and he told her that she would continue to receive 400 mg. of Gabapentin and that it was still being tapered to discontinue.  (Id.)  Plaintiff told Khoo that she did not have any fall or trauma in 2019.  (Id.)  Plaintiff was told that Defendant Mitchell was denying her all pain management but was not given a reason why.  (Id.)  Khoo stated that he would not submit a request for a follow-up with Dr. Taggard because there was no reason since her request for surgery had been denied.  (Id.)  Khoo agreed to submit another request for services and she was told that custody was to evaluate her pain and call them.  (Id.)

On December 31, 2019, Plaintiff saw her mental health provider for severe depression over the denial of her surgery and re-evaluation and her pain.  (Id.)

On January 2, 2020, Defendant Song and Showalter documented on the denial of the

1    request for a neurosurgery evaluation that Plaintiff's request had already been denied by the
2    SMART committee. (Id.) Khoo wrote on the request that he did not know that the neurosurgeon
3    denies to see Plaintiff again because the surgery had been denied by Defendant Song. (Id.)

4          On January 6, 2020, Plaintiff spoke with housing staff who told her they were aware that
5    medical had directed custody staff to falsely report on her activities of daily living by email
6    rather than CDCR 128B chronos and that the lieutenants were requesting the documentation.
7    (Id.) Plaintiff was seen by her mental health provider on this date for uncontrollable anxiety due
8    to the unrelieved pain and insomnia. (Id.) Her mental health provider emailed Khoo to ask him
9    to help her get the relief she needs. (Id.) Khoo responded that Plaintiff's pain was not that
10   severe and that she was faking it. (Id. at 11.)

11         On January 8, 2020, Plaintiff was told that her request for a follow up with the
12   neurosurgeon had been submitted and denied by Showalter on January 2, 2020, and Khoo
13   refused to submit any more requests for care by a neurosurgeon. (Id.) Nurse Lee informed
14   Plaintiff that she did not meet the InterQual criteria for surgery. (Id.)

15         On January 9, 2020, Antinello saw Plaintiff for worsening pain at the screw site,
16   numbness on the soles of her feet, and rectal pressure. (Id.) Antinello informed Plaintiff that
17   custody reported no discernable difficulty in ambulating, but she ordered Ketorolac IV push, but
18   it was not for IV use. (Id.) Antinello told Plaintiff that her revision surgery was denied because
19   Defendant Song and Showalter stated that the plates in her back had not moved. (Id.)

20         On January 10, 2020, Plaintiff was referred to a neurologist for complex regional pain
21   syndrome. (Id.)

22         On January 23, 2020, Plaintiff was told that Khoo had not submitted a request for a re-
23   evaluation after the denial of her surgery on January 2, 2020, and that Khoo has a language
24   barrier. (Id.)

25         On January 28, 2020, Plaintiff spoke with Showalter about the denial of her revision
26   surgery in September 2019 and he confirmed that the surgery was denied because Defendant
27   Song found that the plates had not shifted. (Id.)

28         On January 29, 2020, an addendum to the December 14, 2019 x-ray showed stress at

interface screws and bone.  (Id.)

On February 5, 2020, Khoo told Plaintiff that they were trying to find a third neurologist but had been unable to find one.  (Id.)  Defendant Mitchell denied referral to Drs. Senegor or Taggard and denied Plaintiff any narcotic pain medication and Plaintiff was only allowed injections of Toradol despite it being contradicted for use in patients on Celebrex.  (Id.)

Khoo had Plaintiff sign a waiver for Toradol and refused to prescribe Tramadol although it had been recommended by Dr. Taggard.  (Id.)

On February 20, 2020, Plaintiff had a pain management consultation with Dr. Malhorta who stated that Plaintiff needed to be seen by the neurosurgeon who did her surgery due to the extent of the revision.  (Id.)

Plaintiff was completely off of Gabapentin by February 23, 2020.  (Id. at 12.)  On February 27, 2020, Plaintiff received a response from Showalter stating that the denials of the request for services had been made by the SMART committee at the state level.  (Id.)

On May 15, 2020, Plaintiff saw Khoo complaining that she was not able to cross her right leg over the left while sitting in a chair without pain and sharp pain to the left lumbar spine. (Id.)  Khoo told Plaintiff that he would reconsider a third request for services for a neurosurgery consult, but charted that no request for services was submitted because surgery can lead to premature death and he would continue conservative approaches.  (Id.)

On June 5, 2020, nurse Le told Plaintiff that he would email Khoo to find out why a request for services was not submitted.  (Id.)

On June 22, 2020, Plaintiff's health care appeals were closed.  (Id.)

An addendum to comparison x-rays was done on July 5, 2020.  (Id.)  On July 23, 2020, Plaintiff saw Dr. Phan requesting a comparison reread of all lumbar spine x-rays to check on the left S1 screw migration.  (Id.)  No comparison was done.  (Id.)

Plaintiff was told that the Ketorolac was discontinued due to a bleeding risk and no replacement was given.  (Id.)

On August 18, 2020, a third request for services was approved by Defendant Showalter. (Id.)

On September 18, 2020, Khoo informed Plaintiff that Gabapentin was not indicated for neuropathic pain and CCHCS disallows it for this indication.  (Id.)

On October 20, 2020, Plaintiff was examined by Nurse Cordrey and Medical Assistant King who confirmed a knot in her right lumbar spine and burning in the S1 area.  (Id.)  A lumbar spine x-ray was ordered.  (Id.)

The October 27, 2020 x-ray confirmed a displaced left S1 screw fracture.  (Id.)

On November 6, 2020, Plaintiff had a telemed consult with Dr. Segal.  (Id.)  Dr. Segal had an obvious stroke and was so incoherent that the nurse and Plaintiff could not understand him.  (Id.)  Dr. Segal failed to address the L5-S1 fusion and revision plan and recommended only to remove all existing hardware, leaving Plaintiff's scoliosis and failed fusion unsupported and did not tell Plaintiff that he would not be performing the surgery.  (Id.)

On December 1, 2020, Plaintiff had an appointment with Khoo to review Dr. Segal's report.  (Id. at 13.)  Dr. Segal recommended Gabapentin and removal of all hardware but not a revision surgery and Dr. Ramberg would be performing the surgery who Plaintiff has never seen.  (Id.)  Khoo said he could not order Gabapentin because it would be denied by Defendant Mitchell, but that he would talk to Defendant Mitchell about Plaintiff's request to be seen by either Drs. Senegor or Taggard.  (Id.)

On December 2, 2020, Nurse Cordrey told Plaintiff that Defendant Mitchell said that it was Dr. Segal or no treatment at all.  (Id.)  On December 3, 2020, Plaintiff was seen by her mental health provider for depression.  (Id.)

**B.      Plaintiff's Miscellaneous Motions**

1.      Motion to Dismiss Defendants' Cross-Motion for Summary Judgment (ECF No. 136)

Plaintiff argues that Defendant's cross-motion for summary judgment is an "incorrect" counterclaim filed under Federal Rule of Civil Procedure 13.  Contrary to Plaintiff's contention, Defendants' cross-motion for summary judgment is a properly filed dispositive motion under Federal Rule of Civil Procedure 56.  Accordingly, there is no merit to Plaintiff's argument and her motion to dismiss Defendants' cross-motion for summary judgment should be denied.

1    2.    Motion to Dismiss Declaration of Dr. Feinberg (ECF No. 137)

2    Plaintiff moves to dismiss the declaration of Dr. Feinberg, on the grounds that it failed to

3    reference Plaintiff's summary judgment materials.  Plaintiff contends that Dr. Feinberg failed to

4    read "the two documents [that] he is supposedly helping defendants object to," and argues that he

5    is unfamiliar with her "pertinent" documents.  (ECF No. 137, at 1.)  Plaintiff also contends that

6    his declaration should be dismissed until Defendants receive leave of court "to file a valid

7    counterclaim."  (Id.)

8    Dr. Feinber's specialized expertise, review of the operative pleading, and review of

9    Plaintiff's medical records render his opinions both admissible and probative because based on

10   "scientifically valid principles" and "rest[ing] on a reliable foundation ... relevant to the task at

11   hand."  Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 597 (1993); see also

12   Hopkins v. Dow Corning Corporation, 33 F.3d 1116, 1125 (9th Cir. 1994) (expert medical

13   opinion based on review of medical records, clinical experience and relevant medical literature

14   constitutes scientifically valid reasoning or methodology) (citing Daubert, 509 U.S. at 592–93).

15   Challenges to medical expert opinions that do not include the expert's physical examination of

16   the patient remain "based on sufficient facts and data ... [that] go to weight, not admissibility."  In

17   re Toyota Motor Corp., 978 F.Supp.2d 1053, 1073 (C.D. Cal. 2013).  Plaintiff has failed to

18   demonstrate that Dr. Feinberg's expert opinion was not based on sufficient facts or data.

19   Accordingly, Plaintiff's motion to dismiss the declaration of Dr. Feinberg should be denied.

20   3.    Motion to Dismiss Declaration of DAG Gronna and Plaintiff's Deposition

21         Transcript (ECF No. 138)

22   Plaintiff also seeks to dismiss the declaration of defense counsel and to strike her

23   deposition testimony taken under oath.

24   On motion for summary judgment the content of documents "may be authenticated not

25   only through personal knowledge ... but also by any manner permitted by Fed. R. Evid. 901(b) or

26   902." Holmes v. Home Depot USA, Inc., No. 1:06–cv–01527–SMS, 2008 WL 4966098, *8

27   (E.D. Cal. Nov.20, 2008).  Documents may be authenticated by "[d]istinctive characteristics and

28   the like," including "[a]ppearance, contents, substance, internal patterns, or other distinctive

1    characteristics, taken in conjunction with circumstances ." Fed. R. Evid. 901(b)(4).

2           Defendants have made a prima facie showing of authenticity of the contents of the

3    deposition extracts considering counsel's affidavit and the contents, nature, and appearance of

4    the documents submitted, as well as explicit references to the deponents within the documents.

5    See E.W. French & Sons, Inc., v. Gen'l Portland Inc., 885 F.2d 1392, 1398 (9th Cir.1989); Hill

6    v. Opus Corp., 464 B.R. 361, 368 (C.D.Cal.2011); Federal Rule of Evidence 901(b).

7           Plaintiff has not demonstrated that the proferred deposition extracts from her deposition

8    are inadmissible for purposes of avoiding summary judgment.  See Renteria v. Oyarzun, CV No.

9    05–392–BR, 2007 WL 1229418, *2 (D. Or. Apr.23, 2007) (in the absence of evidence showing

10   that the excerpts were fraudulent, deposition transcripts that lacked a copy of the court reporter's

11   certification but did include the cover page identifying the deponent, the action and the time and

12   place of the deposition were sufficiently authenticated under Rule 901(b)(4)); Prineville Sawmill

13   Co. v. Longview Fibre Co., CV No. 01–1073–BR, 2002 WL 31974434, *11 (D. Or. Sept.23,

14   2002), reversed on other grounds, 97 Fed. Appx. 133 (9th Cir.2004) (in the absence of evidence

15   showing that they were fraudulent, deposition excerpts that included the cover page of the

16   deposition identifying the deponent, the action and the time and place of the deposition and that

17   were attached to an affidavit in which counsel stated that the excerpts were true copies of the

18   transcripts provided by the court reporter who took the deposition were sufficiently authenticated

19   under Rule 901(b)(4)); Kenney v. Paderes, No. Civ. 00–00315 EMK, 2002 WL 31863882, *2

20   (D. Haw. Aug.21, 2002) ("Although the transcripts do not contain the reporter's signed

21   certificate, the cover page of the deposition transcripts of both Dr. Allen and Dr. Lauer provide

22   the name of the deponent, the case name and civil number, and indicates that it is a certified copy

23   .... Furthermore, by reviewing its contents, this Court is able to make the determination that the

24   deposition transcripts are authenticated. Fed. R. Evid. 901(b) (4).").  Accordingly, Plaintiff's

25   motion to dismiss the declaration of DAG Gronna and Plaintiff's deposition transcript should be

26   denied.

27   ///

28   ///

1          4.      Motion for Judgment as Matter of Law (ECF No. 139)

2          Plaintiff moves the Court to enter judgment as a matter of law with respect to her motion

3  for summary judgment.  (ECF No. 139.)  As stated in the Court's November 14, 2022 order,

4  "[b]oth parties have filed motions for summary judgment and contrary to Plaintiff's contention,

5  there has been no ruling that she has prevailed as a matter of law."  (ECF No. 141, at 2.)

6  Therefore, while Plaintiff may believe she has meet her summary judgment burden and defeated

7  Defendants' cross-motion for summary judgment, Plaintiff has not demonstrated that she is

8  entitled to judgment as a matter of law and the motion should be denied.

9          5.      Motion to Dismiss Portions of Declarations of Drs. Song and Mitchell

10         Plaintiff also seeks to strike portions of the declarations of Drs. Song and Mitchell which

11  were not used in opposing Plaintiff's motion for summary judgment.  (ECF No. 140, at 1.)  More

12  specifically, Plaintiff seeks to strike certain paragraphs from Drs. Song and Mitchell's

13  declarations because "they pertain to NO properly filed Court document."  (ECF No. 140, at 2.)

14         Plaintiff's motion is unfounded in law or fact.  As noted above, Defendants properly filed

15  an opposition to Plaintiff's motion for summary judgment, and their own dispositive motion, on

16  the same day.  (ECF Nos. 125, 126.)  Plaintiff mistakenly argues that Defendants' cross-motion

17  for summary judgment was procedurally improper, which lacks merit.  In addition, Plaintiff has

18  failed to demonstrate any legal basis to challenge the declarations of Drs. Song and Mitchell on

19  evidentiary grounds.  Accordingly, Plaintiff's motion to dismiss portions of the declarations of

20  Drs. Song and Mitchell should be denied.

21     **C.      Statement of Undisputed Facts[2,3]**

22         1.      Plaintiff Dana Gray (CDCR No. W76776) is an inmate in the custody of the

23  California Department of Corrections and Rehabilitation (CDCR), and at all times relevant to the

24  second amended complaint was incarcerated at the Central California Women's Facility

25  (CCWF).  (SAC, at 1.)  Plaintiff is subject to monitoring by custody staff in her housing unit and

26

27  [2] The statements of undisputed facts are compiled by both parties' statement of undisputed facts.  (ECF Nos. 105, 125.)

28  [3] Hereinafter referred to as "UDF."

1  she is serving an indeterminate sentence of life without parole.

2       2.      Plaintiff filed the original complaint in this action on July 29, 2020.  (ECF No. 1.)

3       3.      Plaintiff is not a medical professional, and has never obtained a physician's

4  license.  Prior to her period of incarceration, Plaintiff worked as a nurse.  However, Plaintiff has

5  not worked as a nurse since 1993, when she was terminated from her position for

6  misappropriating narcotics.  (Pl. Dep. at 11:3-11:7, 9:20-9.25, 11:7-11:8, 160:22-161:1, 161:2-

7  161.16.)

8       4.      Dr. Mitchell was the Chief Medical Executive (CME) of CCWF at all times

9  relevant to the allegations in the SAC.  (SAC, at 3.)

10      5.      Dr. Mitchell is a medical doctor licensed by the State of California.  (Declaration

11  of R. Mitchell (Mitchell Decl.), at ¶ 2.)

12      6.      Dr. Song was the Deputy Medical Executive (DME) of clinical operations in the

13  utilization management unit at all times relevant to the allegations in the SAC.  (Declaration of

14  G. Song (Song Decl.), at ¶ 28.)

15      7.      Dr. Song is a medical doctor licensed by the State of California.  (Song Decl., at ¶

16  1.)

17      8.      Dr. Mitchell separated from CDCR on January 31, 2022.  Since May 9, 2022, Dr.

18  Ola has been the CME of CCWF.  (Declaration of A. Ola (Ola Decl.), at ¶ 3; Mitchell Decl., at ¶

19  3.)

20      9.      Dr. Ola is being sued in his official capacity for prospective relief only.  (Ola

21  Decl., at ¶ 4.)

22      10.     Dr. Ola is a medical doctor licensed by the State of California.  (Ola Decl., at ¶ 1.)

23      11.     Neither Dr. Mitchell nor Dr. Song have treated Plaintiff as her primary care

24  provider, or otherwise provided direct clinical services to Plaintiff.  (Pl. Dep. at 44:12-44:14,

25  44:17-22, 61:4-61:6; Mitchell Decl., at ¶ 9; Song Decl., at ¶ 29.)

26      12.     Dr. Mitchell is aware of portions of Plaintiff's treatments and is aware of elements

27  of Plaintiff's care, but no personal treatment was performed.  (Mitchell Decl., at ¶¶ 59-61.)

28      12.     California Correctional Health Care Services (CCHCS) must manage and deliver

1   medically necessary health care services to its inmate-patient population.  (Song Decl., at ¶ 13.)

2        13.     The utilization management program ensures the appropriate use of limited health

3   care resources, including but not limited to medical procedures, consultations with specialists,

4   and diagnostic studies, by reviewing high cost, high risk, exceptional, and complex patient cases

5   via an institutional and headquarters committee structure.  (Song Decl., at ¶ 13.)

6        14.     With the exception of an emergency healthcare request, the health care

7   department operations manual section 3.1.11(c)(2) requires a request for outpatient specialty

8   services, such as referral to outside neurosurgeons and requests for spine surgery, to proceed

9   through a preauthorization process.  (Song Decl., at ¶ 14; Ola Decl., at ¶ 4.)

10       15.     At the first level, the patient's PCP must submit a Request for Services (RFS) to

11  the institution's utilization management nurse for review.  The utilization management nurse will

12  then determine whether the RFS meets InterQual criteria and refer it to the second level of

13  preauthorization review.  (Song Decl., at ¶ 15, Ex. F.)

14       16.     Meeting InterQual criteria is not dispositive of whether a RFS will, or should,

15  ultimately be approved.  (Song Decl., at ¶ 15; Mitchell Decl., at ¶ 36.)

16       17.     At all times relevant to this action, all non-emergent requests for lumbar and

17  cervical spine surgeries, including lumbar fusion revision surgery, that are not denied at the

18  second level of review, must be referred to the Statewide Medical Authorization Review Team

19  (SMART Committee), a higher level of review, to determine if the specialty service is medically

20  necessary.  (Song Decl., at ¶ 18.)

21       18.     CCHCS implemented the mandatory referral requirement to the SMART

22  Committee for lumbar spine surgery due to the high percentage of post-operative complications

23  associated with spinal surgeries.  The CME has no authority to waive this review requirement.

24  (Song Decl., at ¶ 18.)

25       19.     After reviewing a patient's case for the referred RFS, the voting SMART

26  Committee members vote to approve or nor approve the RFS.  (Song Decl., at ¶ 20.)

27       20.     At all times relevant to the SAC, Dr. Mitchell was not a member of the SMART

28  Committee.  (Mitchell Decl., at ¶ 35.)

21.     At all times relevant to the SAC, Dr. Song was the chair of the SMART Committee.  (Song Decl., at ¶ 19.)

22.     It is undisputed that Plaintiff's chronic low back pain constitutes a serious medical need, and Plaintiff continues to self-report symptoms related to back pain.  (Pl. Decl., at ¶¶ 5, 6, 7, 8, 9, 10, 11, 12, 16.)

22.     On January 4, 2018, Plaintiff underwent L2-S1 fusion surgery performed by neurosurgeon, Dr. Senegor.

23.     On July 2, 2018, Plaintiff saw Dr. Senegor for 6-month follow-up from her back surgery.  Dr. Senegor opined that Plaintiff was coming along as well as could be expect. (Feinberg Decl., at ¶ 17.)

24.     Plaintiff reported new left hip pain to Dr. Khoo on August 1, 2018.  (Dr. Khoo Progress Notes, Pl. Ex. E (Set 4), ECF No. 105.)

24.     On September 7, 2018, x-rays of Plaintiff's lumbosacral spine and sacroiliac joints were read by the radiologist as showing "a question of right S1 screw lucency raising the possibility of loosening."  (Feinberg Decl., at ¶ 21; Song Decl., at ¶ 32.)

25.     Ms. Gray attended a nine month follow-up appointment with Dr. Senegor on October 15, 2018.  Ms. Gray reported that she was beginning to experience pain in her low back/right hip area, and at times along the back of her thigh.  Dr. Senegor noted that Ms. Gray's reasonably good recovery and improvement in mobility was not being held back by these new problems.  (Feinberg Decl., at ¶ 23; Song Decl., at ¶ 33.)

26.     Regarding the x-rays of September 7, 2018, Dr. Senegor opined on October 15, 2018, that Plaintiff was developing bone resorption around the right S1 screw and felt that it suggested either a failed fusion or a delayed fusion at the L5-S1 segment.  Dr. Senegor felt that it was premature to diagnose a fusion failure prior to one year from the surgery.  (Feinberg Decl., at ¶ 23; Song Decl., at ¶ 33.)

27.     Dr. Senegor's October 15, 2018 treatment notes indicate that "occasionally setscrews can break" due to metal fatigue, and not the fault of Plaintiff.  (Pl. Ex. E (Set 4), ECF No. 105.)

1    27.    A November 15, 2018 CT scan of Plaintiff's lumbar spine noted that the clinical

2    indication for performing the study included "suspected for screw break/delayed fusion/failed

3    fusion." Normally, when appropriate, reading radiologists would note confirmed findings on CT

4    reports. However, despite the reason for performing the CT scan, no such issues were reported

5    on the CT scan findings at that time. (Feinberg Decl., at ¶ 24; Mitchell Decl., at ¶ 27.)

6    28.    On December 19, 2018, lumbar spine flexion-extension x-rays were taken of

7    Plaintiff. There was no evidence of pathologic motion. When compared by the radiologist with

8    films performed on September 7, 2018, the December 19, 2018, x-ray notes made no mention of

9    screw lucency or loosening. (Feinberg Decl., at ¶ 25.)

10    29.    On January 7, 2019, Plaintiff saw Dr. Senegor for one year follow-up from her

11    back surgery. Dr. Senegor opined that Plaintiff was experiencing fusion failure at L5-S1, and

12    suggested a two-stage reconstruction surgery. (Feinberg Decl., at ¶ 26.)

13    30.    Dr. Senegor explained that the risks associated with the proposed lumbar fusion

14    revision surgery included paralysis. (Pl. Dep. at 24:23-25:4.)

15    31.    On January 10, 2019, Dr. Khoo submitted a RFS for the revision surgery

16    recommended by Dr. Senegor, which was assigned the tracking number CCWF-18/19-1399407

17    (RFS 1399407). (Feinberg Decl., at ¶ 27.)

18    32.    On January 15, 2019, at the second level of pre-authorization review, Dr. Singh

19    denied RFS 1399407 because more information was needed. (Feinberg Decl., at ¶ 29.)

20    33.    On January 29, 2019, Dr. Khoo resubmitted a RFS for back surgery, identified as

21    CCWF-18/19-1406260 (RFS 1406260). (Feinberg Decl., at ¶ 33.)

22    34.    On February 4, 2019, Dr. Singh denied RFS 1406260, but recommended that the

23    case be presented in the Medical Authorization Review Committee (MARC). (Feinberg Decl., at

24    ¶ 34.)

25    35.    Dr. Mitchell did not review or deny RFS 1406260 at the second level of

26    preauthorization review. (Mitchell Decl., at ¶ 25.)

27    36.    The MARC is a group of institutional healthcare providers at CCWF that

28    discusses a variety of inmate cases and proposed interventions. The MARC could also consider

whether a referred specialty service, which did not meet InterQual criteria, should be approved and ultimately referred to the utilization management headquarters (as relevant here, the SMART Committee) for mandatory third level review.  (Mitchell Decl., at ¶ 19.)

37.     Because RFS 1406260 was denied at the second level of review, it was not referred to the utilization management headquarters (as relevant here, the SMART Committee) for third (final) level review.  Instead, the MARC at CCWF reviewed the request for lumbar fusion revision surgery before continuing through the pre-authorization process.  (Mitchell Decl., at ¶¶ 18, 19, 26.)

38.     As CME, Dr. Mitchell's involvement in MARC meetings was administrative.  He was not a voting member of the MARC.  (Mitchell Decl., at ¶¶ 20, 28.)

39.     Dr. Khoo presented Ms. Gray's case for lumbar fusion revision surgery to the MARC on February 21, 2019.  (Mitchell Decl., at ¶ 26; Feinberg Decl., at ¶ 36.)

40.     The MARC voted unanimously to deny the lumbar fusion revision surgery on February 21, 2019, and Dr. Singh noted that Dr. Khoo had the option to consider a referral to a different neurosurgeon for a second opinion.  (Feinberg Decl., at ¶ 36.)  Plaintiff's ability to ambulate was taken into account when the voting MARC Committee members denied her request for surgery on February 21, 2019.  (Id.)

42.     The MARC denied the requested surgery because Plaintiff's imaging studies did not suggest any conclusive evidence of hardware failure or failed fusion, Plaintiff had no worsening of function or neutral compromise, repeat back surgery for pain relief had a poor success rate, and the risks of complications outweighed the benefits of the requested surgery. (Mitchell Decl., at ¶ 27.)

43.     On March 20, 2019, Dr. Khoo submitted an RFS for a second neurosurgical opinion, identified as CCWF-18/19-1525570 (RFS 1325570).  Dr. Singh approved RFS 1525570 on the same day.  (Feinberg Decl., at ¶ 39.)

44.     On March 26, 2019, a radiologist added an addendum to Plaintiff's November 15, 2018 CT scan stating "lucency surrounding the right pedicle screw at the S1 level is confirmed." (Feinberg Decl., at ¶ 40.)

45.    On March 29, 2019, lumbar spine x-rays ordered by Dr. Singh were performed. The radiologist's impression was that it showed "fractured left S1 support screw and potentially loose right S1 support screw." (Feinberg Decl., at ¶ 41.)

46.    On June 12, 2019, Plaintiff saw neurosurgeon Dr. Taggard for a second neurosurgery opinion regarding possible hardware failure. Dr. Taggard reviewed Plaintiff's November 15, 2018 CT scan and March 29, 2019 x-ray, but did not provide a diagnosis or recommend surgery at that time. (Feinberg Decl., at ¶ 44; Song Decl., at ¶ 39.)

47.    A CT scan was performed on July 11, 2019. The impression of the radiologist was that there was a fracture of the left S1 screw, as well as lucency along the right S1 screw that suggested loosening. (Feinberg Decl., at ¶ 45.)

48.    Plaintiff self-reported complaints of back pain between December 27, 2019 and July 20, 2021.

48.    On August 28, 2019, Dr. Taggard reviewed findings of pseudarthrosis with lucency around hardware at L5-S1 with Plaintiff. Dr. Taggard suggested a revision of lumbar fusion surgery. (Feinberg Decl., at ¶ 49.)

49.    As explained by Dr. Taggard, the risks associated with the proposed lumbar fusion revision surgery were possibility of dural tear due to scar tissue, hematoma, infection, paralysis, and a longer recovery period after surgery. (Song Decl., at ¶ 43; Pl. Dep. at 36:21-37:19.)

50.    On September 6, 2019, Plaintiff saw Dr. Khoo for a follow-up visit regarding Dr. Taggard's August 28, 2019 appointment. On physical exam, Plaintiff was noted to have a slow walking speed but exhibited no balance problem. (Feinberg Decl., at ¶ 50.)

51.    Dr. Khoo submitted an RFS for the revision surgery, designated as CCWF-18/19-1494552 (RFS 1494552), on September 6, 2019. (Feinberg Decl., at ¶ 50.)

52.    On September 10, 2019, Dr. Mitchell referred RFS 1494552 to the SMART Committee for mandatory review, since it involved an elective request for spine surgery. (Mitchell Decl., at ¶ 30; Feinberg Decl., at ¶ 51.)

53.    The SMART Committee denied RFS 149552 on October 1, 2019. (Feinberg

Decl., at ¶ 53.)

54.     To date, no other RFS order seeking lumbar fusion revision surgery for Plaintiff, besides RFS 1494552, has been presented to the SMART Committee for mandatory, third-level review.  In other words, since 2019, RFS 1494552 is the only request for lumbar fusion revision surgery that the SMART Committee had considered and not approved for Plaintiff.  (Song Decl., at ¶ 54.)

55.     On October 1, 2019, Dr. Song, in her capacity as Chair of the SMART Committee, documented that RFS 1491522 had been denied by SMART.  The committee's reasons for the denial were documented as being Plaintiff's medical records demonstrating her slow but otherwise normal gait without balance problems, her ability to hop on and off an examination table unassisted, and her risks of repeat surgery appearing to outweigh the potential benefits for her.  (Feinberg Decl., at ¶ 53.)  Plaintiff's functional abilities and ability to ambulate factored into the SMART Committee's decision to deny surgery on October 1, 2019.  (Id.)

56.     As SMART Committee Chair, Dr. Song did not personally vote to deny Plaintiff's RFS on October 1, 2019.  (Song Decl., at ¶ 28.)

57.     Dr. Senegor recommended lumbar fusion revision surgery.  (Pl. Ex. No. E (Set 4), ECF No. 105.)

58.     Dr. Taggard recommended lumbar fusion revision surgery.  (Pl. Ex. E (Set 4), ECF No. 105.)

58.     On November 6, 2020, Plaintiff had a third neurosurgery consultation with Dr. Segal.  Dr. Segal suspected that Plaintiff's fusion may not be solid at LS-S1, and did not recommend lumbar fusion revision surgery.  (Mitchell Decl., at ¶ 40.)

58.     Dr. Segal recommended that Plaintiff undergo surgery to inspect the fusion and remove the hardware at L5-S1.  (Mitchell Decl., at ¶ 40.)

59.     Plaintiff refused surgery with Dr. Segal on December 1, 2020, ending the preauthorization process for surgery.  (Mitchell Decl., at ¶¶ 41, 42.)

60.     On or about April 18, 2019, CCHCS issued a memorandum stating that the System-wide Pharmacy and Therapeutics Committee reviewed patient safety concerns with the

1   non-formulary medication, gabapentin, and limited the prescription of gabapentin to its FDS-

2   approved indications as clinically appropriate.  (Feinberg Decl., at ¶ 43.)  On its face, the

3   memorandum vested clinical providers with discretion regarding the prescription of gabapentin.

4   (Feinberg Decl., at ¶¶ 43, 60.)

5       61.   Gabapentin (Neurontin) is a medication that the Food and Drug Administrative

6   (FDA) approved for treatment of partial seizures and postherpetic neuralgia.  It is sometimes

7   used off-label for other types of neuropathic pain.  (Feinberg Decl., at ¶ 11.)

8       62.   On August 22, 2019, Plaintiff began to be weened off gabapentin.  (Feinberg

9   Decl., at ¶ 47.)

10      63.   Defendants Song and Mitchell were familiar with utilization management

11  procedures in 2019.  (Song Decl., at ¶¶ 9-13; Mitchell Decl., at ¶ 4.)

12      63.   Continued ambulation as much as possible is one of the CCHCS's guidelines to

13  patients for self-management of chronic pain.  (Pl. Ex. D(5), ECF No. 105.)

14      64.   Plaintiff mitigates her pain and maintains her mobility and general health by

15  following CCHCS pain self-management guidelines.  (Pl. Ex. D(5), ECF No. 105.)

16      **D.   Plaintiff's Motion for Summary Judgment**

17      Plaintiff contends that "[t]here is ample evidence from which to directly know or to

18  definitely infer that defendants Song and Mitchell both knew of plaintiff's SMN when they

19  denied her lumbar revision surgeries in 2019."  (Pl. MSJ, ECF No. 105, at 31.)

20      Defendants argue that Plaintiff's summary judgment motion fails to provide any evidence

21  showing that their actions were deliberately indifferent, or otherwise medically unacceptable

22  under the circumstances.

23      1.   Deliberate Indifference to Serious Medical Need

24      While the Eighth Amendment of the United States Constitution entitles Plaintiff to

25  medical care, the Eighth Amendment is violated only when a prison official acts with deliberate

26  indifference to an inmate's serious medical needs.  Snow v. McDaniel, 681 F.3d 978, 985 (9th

27  Cir. 2012), overruled in part on other grounds, Peralta v. Dillard, 744 F.3d 1076, 1082-83 (9th

28  Cir. 2014); Wilhelm v. Rotman, 680 F.3d 1113, 1122 (9th Cir. 2012); Jett v. Penner, 439 F.3d

1091, 1096 (9th Cir. 2006).  Plaintiff "must show (1) a serious medical need by demonstrating that failure to treat [his] condition could result in further significant injury or the unnecessary and wanton infliction of pain," and (2) that "the defendant's response to the need was deliberately indifferent."  Wilhelm, 680 F.3d at 1122 (citing Jett, 439 F.3d at 1096).   The requisite state of mind is one of subjective recklessness, which entails more than ordinary lack of due care.  Snow, 681 F.3d at 985 (citation and quotation marks omitted); Wilhelm, 680 F.3d at 1122.

"A difference of opinion between a physician and the prisoner – or between medical professionals – concerning what medical care is appropriate does not amount to deliberate indifference."  Snow, 681 F.3d at 987 (citing Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989), overruled in part on other grounds, Peralta, 744 F.3d at 1082-83; Wilhelm, 680 F.3d at 1122-23 (citing Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1986).  Rather, Plaintiff "must show that the course of treatment the doctors chose was medically unacceptable under the circumstances and that the defendants chose this course in conscious disregard of an excessive risk to [his] health."  Snow, 681 F.3d at 988 (citing Jackson, 90 F.3d at 332) (internal quotation marks omitted).).  In addition, "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner."  Estelle v. Gamble, 429 U.S. 97, 106 (1977); Snow v. McDaniel, 681 F.3d at 987-88, overruled in part on other grounds, Peralta v. Dillard, 744 F.3d at 1082-83; Wilhelm, 680 F.3d at 1122.

Plaintiff has failed to demonstrate that she is entitled to summary judgment as a matter of law.

With regard to Defendant Song, Plaintiff submits that Dr. Song's deliberate indifference can be inferred, based on the failure to follow utilization management policy regarding the use of InterQual criteria.  (Pl. MSJ, ECF No. 105, at 20-30.)   However, it is undisputed that non-emergent requests for specialty services, such as Plaintiff's request for lumbar fusion revision surgery that the SMART Committee evaluated on October 1, 2019, are subject to an institutional and headquarters pre-authorization process.  (UDF 14.)  At the first level, the patient's PCP must submit a Request for Services (RFS) to the institution's utilization management nurse for review. The utilization management nurse will then determine whether the RFS meets InterQual criteria

and refer it to the second level of preauthorization review.  (UDF 15.)  Meeting InterQual criteria is not dispositive of whether a RFS will, or should, ultimately be approved.  (UDF 16.)  At all times relevant to this action, all non-emergent requests for lumbar and cervical spine surgeries, including lumbar fusion revision surgery, that are not denied at the second level of review, must be referred to the Statewide Medical Authorization Review Team (SMART Committee), a higher level of review, to determine if the specialty service is medically necessary.  (UDF 17.)  CCHCS implemented the mandatory referral requirement to the SMART Committee for lumbar spine surgery due to the high percentage of post-operative complications associated with spinal surgeries.  The CME has no authority to waive this review requirement.  (UDF 18.)  In addition, Plaintiff has failed to demonstrate that a policy that states a RFS must be approved if it meets InterQual criteria at the first level.  Thus, Plaintiff has failed to demonstrate that Dr. Song was deliberately indifferent based on the alleged failure to follow utilization management policy regarding the use of InterQual criteria.

Plaintiff also contends that Dr. Song failed to make an "informed" or "professional judgment," solely denied the relevant RFS on October 1, 2019, failed to review more than a few documents in Plaintiff's SMART requisition packet, and only considered Plaintiff's ability  to ambulate when rendering a decision.  (ECF No. 105, at 33.)  However, it is undisputed that Dr. Song was the Chair of the SMART Committee on October 1, 2019, and did not vote to deny Plaintiff's surgery.  (UDF 56.)  When the SMART Committee voted to not approve Plaintiff's request for surgery in 2019, Dr. Song served the administrative function of documenting the denial.  (UDF 55.)

Pursuant to section 3999.98 of Title 15 of the California Code of Regulations, "necessary" health care services means services that are determined by the attending or primary medical provider(s) to be needed to protect life, prevent significant illness or disability, or alleviate severe pain, and are supported by health outcome data or clinical evidence as being an effective health care service for the purpose intended, or, in the absence of available health outcome data, is judged to be necessary and is supported by diagnostic information or specialty consultation. In this context, "significant illness and disability" means any medical, mental

1  health, or dental condition that causes or may cause, if left untreated, a severe limitation of

2  function or ability to perform the daily activities of life or that may cause premature death.

3  "Severe pain" means a degree of discomfort that significantly disables the patient from

4  reasonable independent function. Further, "outcome data or clinical evidence" is defined as the

5  professionally accepted results of studies and analyses, using evidence-based methodologies and

6  expert clinical judgment, regarding the effectiveness of various health care services, how those

7  services relate to patient morbidity and mortality, and overall efficiency and effectiveness of

8  care.  (Feinberg Decl., at ¶ 52; Song Decl., at ¶ 10.)

9      Here, the committee's reasons for the denial were documented as being Plaintiff's

10  medical records demonstrating her slow but otherwise normal gait without balance problems, her

11  ability to hop on and off an examination table unassisted, and her risks of repeat surgery

12  appearing to outweigh the potential benefits for her.  (UDF 55.)  Plaintiff's functional abilities

13  and ability to ambulate factored into the SMART Committee's decision to deny surgery on

14  October 1, 2019.  (Id.)  Although Plaintiff strongly disagrees with the SMART Committee's

15  2019 decision, a different in medical opinion does not give rise to a constitutional violation.

16  Snow, 681 F.3d at 987.

17      Plaintiff also contends that the SMART requisition packet submitted to the SMART

18  Committee was incomplete.  (ECF No. 105, at 34.)  More specifically, Plaintiff contends the

19  packet did not include notes from her January 7, 2019 visit with Dr. Senegor, Dr. Singh's notes

20  confirming a "newly fractured left S1 support screw on x-ray, and an entry regarding the

21  approval of her request to receive a second neurosurgery evaluation.  (Id.)  Nonetheless, Dr.

22  Mitchell declares that he was not responsible for compiling the SMART requisition packet, or

23  reviewing it for completeness, and there is no evidence that Dr. Song had any reason to believe

24  its contents were not accurate.  (Mitchell Decl., at ¶¶ 31-33; Song Decl., at ¶¶ 26, 52-53.)

25  Accordingly, there is no showing that Dr. Song acted with deliberate indifference in this regard.

26      With regard to Defendant Mitchell, Plaintiff argues she was deliberately indifference by

27  allowing treating physicians to underreport their findings and "re-frame" her diagnosis in the

28  medical record, and then refer her to a neurosurgeon (Dr. Segal) that she ultimately refused.

(ECF No. 105, at 37-38.)  Liability may not be imposed on supervisory personnel for the actions or omissions of their subordinates under the theory of respondeat superior. Iqbal, 556 U.S. at 676–77; Simmons v. Navajo Cty., Ariz., 609 F.3d 1011, 1020–21 (9th Cir. 2010); Ewing v. City of Stockton, 588 F.3d 1218, 1235 (9th Cir. 2009); Jones v. Williams, 297 F.3d 930, 934 (9th Cir. 2002). Supervisors may be held liable only if they "participated in or directed the violations, or knew of the violations and failed to act to prevent them." Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989); Corales v. Bennett, 567 F.3d 554, 570 (9th Cir. 2009).  Here, Plaintiff fails to produce non-speculative evidence that Dr. Mitchell condoned false reporting in Plaintiff's medical record.  In addition, prison inmates do not have a protected liberty interest in freedom from alleged classification errors where such errors do not cause the inmates to be subjected to "atypical and significant hardship...in relation to the ordinary incidents of prison life." Sandin v. Conner, 515 U.S. 472, 484 (1995). The same principle applies to claimed due process violations arising from allegedly false information in prison documents, such as medical records. See Hines v. Gomez, 108 F.3d 265, 268-69 (9th Cir. 1997); Freeman v. Rideout, 808 F.2d 949, 951 (2d Cir. 1986) (Prisoners have "no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest," so long as they are "not...deprived of a protected liberty interest without due process of law.").  Thus, the mere presence of this allegedly false information in Plaintiff's medical records does not, without more, violate Plaintiff's constitutional rights.

Furthermore, it is undisputed that Dr. Mitchell was not personally involved in the decision to deny Plaintiff's request for surgery on October 1, 2019.  He was not a member of the SMART Committee, and his only involvement was referring the RFS order to utilization management headquarters for mandatory review.  (UDF 20, 38, 52.)  Moreover, Plaintiff has failed to provide medical expert opinion to support her assertion that the decision to deny surgery was medically unacceptable.  Thus, although Dr. Mitchell knew about the SMART Committee to deny surgery, there is no basis to hold her liable for such decision.

Plaintiff also contends that Dr. Mitchell's response to a Prison Law Office inquiry regarding her denied back surgery demonstrates that she was deliberately indifferent to

Plaintiff's serious medical needs.  However, Dr. Mitchell's response demonstrates that Plaintiff medical condition was being continually assessed by healthcare personnel, and it was not a blanket denial of surgery, but rather reflected that Plaintiff's condition remained unchanged. Thus, Dr. Mitchell's response does not demonstrate deliberate indifference.

To the extent Plaintiff contends his claim involves the ongoing denial of surgery, the undisputed facts demonstrate that the request for lumbar fusion revision surgery was only received and denied once by the SMART Committee.  (UDF 54.)  Indeed, when the preauthorization process started again in 2020, it ended when Plaintiff refused treatment with Dr. Segal.  (UDF 59.)  Plaintiff has not presented evidence that Dr. Mitchell is responsible for the denial of back surgery in 2019, or that he interfered in the RFS process.  (UDF 20, 38, 52.)  In addition, Plaintiff has not presented any expert medical opinion that the cause of her purported symptoms are attributable to Dr. Mitchell.

### 2.   Medical Malpractice

Under California law, "[t]he elements of a medical malpractice claim are (1) the duty of the professional to use such skill, prudence, and diligence as other members of his profession commonly possess and exercise; (2) a breach of that duty; (3) a proximate causal connection between the negligent conduct and resulting injury; and (4) actual loss or damage resulting from the professional's negligence."   Avivi v. Centro Medico Urgente Medical Center, 159 Cal.App.4th 463, 468, n.2 (2008) (internal quotations and citation omitted); Johnson v. Superior Court, 143 Cal.App.4th 297, 305 (2006).

California law requires that plaintiff submit expert medical evidence to support a medical malpractice claim, unless the negligence is obvious to a layperson. Johnson v. Superior Court, 143 Cal. App. 4th 297, 305 (2006). "Whenever the plaintiff claims negligence in the medical context, the plaintiff must present evidence from an expert that the defendant breached his or her duty to the plaintiff and that the breach caused the injury to the plaintiff." Powell v. Kleinman, 151 Cal. App. 4th 112, 123 (2007). California law requires causation to "be proven within a reasonable medical probability based on competent expert testimony." Jones v. Ortho Pharm. Corp., 163 Cal. App. 3d 396, 402 (1985). Therefore, "expert testimony [is] essential to prove

causation," and without such expert testimony, "plaintiff fail[s] to meet his burden on an essential element of the cause of action." <u>Gotschall v. Daley</u>, 96 Cal. App. 4th 479, 484 (2002). Under Rule 56, because plaintiff failed to show required elements for medical malpractice (through expert evidence of breach and causation), defendants are entitled to summary judgment on plaintiff's state law claim as well. <u>See Gonzalez v. United States</u>, No. 19-16935, 2022 WL 1658224, at *1 (9th Cir. May 25, 2022) (affirming grant of summary judgment in favor of defendant because plaintiff failed to submit expert medical evidence to support medical malpractice claim); <u>Woodward v. United States</u>, No. 2:13-cv-00048-MCE-EFB, 2016 WL 5159589, at *8 (E.D. Cal. 2016) (granting summary judgment "because a medical malpractice claim without the required expert testimony concerning standard of care presents no factual issues for trial).

Although Plaintiff contends that the decision to deny her surgery in 2019 amounted to medical malpractice, she has failed to present evidence to support her lay opinion.  It is undisputed that Plaintiff is not a medical expert, and Plaintiff references only the medical records of the neurosurgeons with whom the SMART Committee disagreed.  Plaintiff has not submitted admissible material evidence opining that non-surgical intervention was a deviation of the standard of care.  In fact, there is evidence that some of Plaintiff's imaging studies did not provide clinical evidence of nonunion, and her x-rays contradicted the clinical impressions at times.  (Song Decl., at ¶¶ 34, 45.)   Surgery was denied because Plaintiff was able to perform daily activities, her risks of repeat surgery appearing to outweigh the potential benefits for her. (UDF 55.)  Defendants have presented expert medical opinion that the decision to deny Plaintiff a second back surgery was medically acceptable under the circumstances.  (Feinberg Decl., at ¶¶ 62, 63.)  Moreover, and of significant note, neither Dr. Mitchell nor Dr. Song personally voted to deny Plaintiff's request for surgery on October 1, 2019.  (UDF 38, 56.)  Plaintiff's own lay opinion as to her treatment does not demonstrate that she is entitled to summary judgment as a matter of law on her malpractice claim.

///

///

3.      Pain Management

Plaintiff argues that Dr. Mitchell discontinued her gabapentin prescription for neuropathic pain without providing a systemic relief and denied all opioid medication for breakthrough pain.

The undisputed evidence demonstrates that the gabapentin memorandum advised CCHCS providers to limit the use of gabapentin to its FDA-approved uses, as clinically appropriate.  (UDF 60.)  Contrary to Plaintiff's contention, Dr. Mitchell declares that he was not involved in the decision to initiate Plaintiff's gabapentin taper.   (Mitchell Decl.., at ¶¶ 54-58.)  Further, to the extent Plaintiff seeks to hold Dr. Mitchell liable based on his CME role, the evidence does not support Plaintiff's claim that his complaints of pain were ignored by her primary care physicians.  (Mitchell Decl., at ¶¶ 52, 53.)  In addition, Plaintiff does not provide expert opinion regarding the alleged ineffectiveness of her alternative pain medications prescribed by her primary care physician.  See, e.g., Arellano v. Santos, No. 3:18CV02391 BTM WVG, 2021 WL 5140187, at *13 (S.D. Cal. Nov. 4, 2021), reconsideration denied, No. 3:18-CV-2391-BTM-WVG, 2021 WL 6197280 (S.D. Cal. Dec. 30, 2021) ("And while the record also shows Plaintiff repeatedly insisted that only increased levels of Gabapentin were appropriate to treat both his pain and his seizures, Plaintiff is not a medical expert, and his unsupported lay opinion as to the efficacy or superiority of Gabapentin over any alternate medication is insufficient as a matter of law to establish a genuine factual dispute.").

Plaintiff has also failed to met her burden in demonstrating entitlement to summary judgment on her pain management claims regarding the decision to deny opioids.   While Plaintiff submits that Dr. Mitchell was present at the Pain Management Committee meetings that denied her request for long-term tramadol, it is undisputed that Dr. Mitchell was not a voting member in the committee.  (Mitchell Decl., at ¶¶ 52-53.)  In addition, the undisputed evidence demonstrates that chronic opioid therapy was not appropriate in Plaintiff's case, given her high risk of opioid related harm and ability to reasonably function.[4]  (Mitchell Decl., at ¶¶ 52-53;

_____

[4] CCHCS Care Guide: Pain Management Part 3 – Opioid Therapy Introduction states in part: "This care guide is the final part of a 3-part series of care guides for pain management.  Its content is based on the 2016 Centers for Disease Control and Prevention (CDC) Guidelines for Prescribing Opioids and cumulative evidence demonstrating limited

1  Feinberg Decl., at ¶¶ 60-61.)  At best, Plaintiff raises only a difference of medical opinion as to

2  the adequacy of her pain management regimen, which does not give rise to an Eighth

3  Amendment violation.

4          4.      Request for Injunctive Relief

5          To the extent Plaintiff seeks injunctive relief to obtain lumbar fusion revision surgery,

6  Plaintiff has not met her burden of proof.

7          An injunction is an "extraordinary remedy never awarded as of right." Winter v. Nat.

8  Res. Def. Council, Inc., 555 U.S. 7, 24 (2008). "To be entitled to a permanent injunction, a

9  plaintiff must demonstrate: (1) actual success on the merits; (2) that [he] has suffered an

10 irreparable injury; (3) that remedies available at law are inadequate; (4) that the balance of

11 hardships justify a remedy in equity; and (5) that the public interest would not be disserved by a

12 permanent injunction." Edmo v. Corizon, Inc., 935 F.3d 757, 784 (9th Cir. 2019) (quoting Indep.

13 Training & Apprenticeship Program v. Cal. Dep't of Indus. Relations, 730 F.3d 1024, 1032 (9th

14 Cir. 2013)).

15         As discussed above, Plaintiff has failed to show that she is likely to success on the merits

16 based on the evidence presented to the Court.  In addition, Plaintiff has failed to establish the

17 existence of an improper policy or practice that has prevented her from obtaining back surgery to

18 date.  Accordingly, Plaintiff has not demonstrated an entitled to injunctive relief.

19         E.      Defendants' Motion for Summary Judgment

20         Defendants argue they are entitled to summary judgment because neither Dr. Mitchell nor

21 Dr. Song personally voted to deny the requested procedure when presented to the SMART

22 Committee, and the undisputed fact demonstrate that the proposed surgery was not medically

23 necessary.  Dr. Mitchell also argues that he was not deliberately indifferent to Plaintiff's serious

24 medical needs by denying her pain management because the decision to discontinue gabapentin,

25 deny opioids and explore other pain management alternatives was clinically appropriate.  Lastly,

26 Dr. Ola argues that there is no blanket policy in place that has prevented Plaintiff from receiving

27 
28 utility for opioid use in most chronic, non-cancer pain.  Exceptions are made for clinical scenarios involving active cancer treatment, palliative care, and hospice."  Here, it is undisputed that Plaintiff was not receiving cancer treatment and was not terminally ill.

1    lumbar fusion revision surgery and she is not entitled to injunctive relief.

2         1.    Denial of Lumbar Fusion Revision Surgery

3        As previously stated, Plaintiff claims that Dr. Mitchell and Dr. Song were deliberately

4    indifferent to her serious medical needs when they denied her back surgery on October 1, 2019.

5        **a.**    **Deliberate Indifference to Serious Medical Need**

6        While the Eighth Amendment of the United States Constitution entitles Plaintiff to

7    medical care, the Eighth Amendment is violated only when a prison official acts with deliberate

8    indifference to an inmate's serious medical needs. Snow v. McDaniel, 681 F.3d at 985,

9    overruled in part on other grounds, Peralta v. Dillard, 744 F.3d at 1082-83; Wilhelm v. Rotman,

10   680 F.3d at 1122; Jett v. Penner, 439 F.3d at 1096. Plaintiff "must show (1) a serious medical

11   need by demonstrating that failure to treat [his] condition could result in further significant injury

12   or the unnecessary and wanton infliction of pain," and (2) that "the defendant's response to the

13   need was deliberately indifferent." Wilhelm, 680 F.3d at 1122 (citing Jett, 439 F.3d at 1096).

14   The requisite state of mind is one of subjective recklessness, which entails more than ordinary

15   lack of due care. Snow, 681 F.3d at 985 (citation and quotation marks omitted); Wilhelm, 680

16   F.3d at 1122.

17       "A difference of opinion between a physician and the prisoner – or between medical

18   professionals – concerning what medical care is appropriate does not amount to deliberate

19   indifference." Snow, 681 F.3d at 987 (citing Sanchez v. Vild, 891 F.2d at 242), overruled in part

20   on other grounds, Peralta, 744 F.3d at 1082-83; Wilhelm, 680 F.3d at 1122-23 (citing Jackson v.

21   McIntosh, 90 F.3d 330, 332 (9th Cir. 1986). Rather, Plaintiff "must show that the course of

22   treatment the doctors chose was medically unacceptable under the circumstances and that the

23   defendants chose this course in conscious disregard of an excessive risk to [his] health." Snow,

24   681 F.3d at 988 (citing Jackson, 90 F.3d at 332) (internal quotation marks omitted).). In

25   addition, "[m]edical malpractice does not become a constitutional violation merely because the

26   victim is a prisoner." Estelle v. Gamble, 429 U.S. at 106; Snow v. McDaniel, 681 F.3d at 987-

27   88, overruled in part on other grounds, Peralta v. Dillard, 744 F.3d at 1082-83; Wilhelm, 680

28   F.3d at 1122.

1    Here, it is undisputed that Plaintiff's request for lumbar fusion revision surgery was
2  denied on October 1, 2019, because Plaintiff's medical records demonstrated her slow but
3  otherwise normal gait without balance problems, her ability to hop on and off an examination
4  table unassisted, and her risks of repeat surgery appearing to outweigh the potential benefits for
5  her. (Feinberg Decl., at ¶ 53.) Plaintiff's functional abilities and ability to ambulate factored
6  into the SMART Committee's decision to deny surgery on October 1, 2019. (UF 53, 55.) Thus,
7  the SMART Committee determined that the risks of surgery outweighed the benefits or
8  likelihood of success. (UF 55.) While Plaintiff obviously disagrees with the SMART
9  Committee's October 1, 2019, decision, it is clearly established law that any difference of
10 opinion by Plaintiff or a different consulting doctor does not support a claim for deliberate
11 indifference. Snow, 681 F.3d at 987.

12    Plaintiff argues that the SMART Committee denied her lumbar fusion revision surgery
13 because there was a policy in place that required her plate to have moved to qualify for surgery.
14 The Ninth Circuit has held that in limited circumstances a plaintiff may establish deliberate
15 indifference to his serious medical needs by showing defendants adhered to a policy or practice
16 of systematically denying medical care to inmates in his position. Colwell v. Bannister, 763 F.3d
17 1060, 1068 (9th Cir. 2014). In Colwell, the plaintiff, who was blind in one eye due to cataracts,
18 brought suit against officials and supervisory medical personnel in the Nevada Department of
19 Corrections (NDOC), alleging defendants were deliberately indifferent to his serious medical
20 needs in denying his requests for cataract-removal surgery. Id. at 1063. The record suggested the
21 NDOC denied the surgery because of its "one eye policy," under which cataract surgery was
22 systematically refused for an inmate who could function in prison with only one eye. Id. In light
23 of the application of the policy, the Colwell court held that he plaintiff had been denied surgery,
24 "not because it wasn't medically indicated, not because his condition was misdiagnosed, not
25 because the surgery wouldn't have helped him, but because the policy of the NDOC is to require
26 an inmate to ensure reversible blindness in one eye if he can still sett out of the other." Id. at
27 1068. Consequently, it was determined that "the blanket, categorical denial of medically
28 indicated surgery solely on the basis of an administrative policy … is the paradigm of deliberate

1  indifference.  Id. at 1063.

2       Here, Plaintiff has failed to submit admissible evidence to demonstrate that the SMART

3  Committee had a blanket, administrative policy regarding non-emergent requests for spine

4  surgeries.  Indeed, during her deposition, Plaintiff testified that a nurse practitioner informed her

5  that the metal plates in her spine needed to shift before she could qualify for surgery.  (Pl.'s Dep.

6  at 64:18-25.)   However, Plaintiff could not identify any related policy or describe how the

7  purported need for her plate's to shift was linked to the SMART Committee's enforcement of

8  any policy:

9       Q:  [D]id FNP for Dr. Antonello ever specifically tell you directly that your request for

10      surgery was denied due to a policy of your plates needing to shift?

11      A:  She told me that DR. Song said the plates needed to shift.

12      Q:  She said that Dr. Song –

13      A:  I think so.  I think so.  I'm going to refer you to the—to her notes, because I don't

14      have them here, so I can't say.

15      Q:  Do you have any other reason to believe there is a policy that exists at CCHCS or

16      CDCR regarding plates needing to shift to a certain degree before you can get lumbar

17      revision surgery?

18      A:  I have no idea.

19  (Pl.'s Dep. at 65:12-25.)

20      Despite Plaintiff's belief that her plates needed to shift before surgery would be

21  approved, there is no other evidence to support Plaintiff's assertion and the "mere allegation and

22  speculation do not create a factual dispute for purposes of summary judgment."  Loomis v.

23  Cornish, 83 F.3d 991, 997 (9th Cir. 2016).  In addition, there is no evidence that Dr. Song, or the

24  voting members of the SMART Committee, relied on the alleged policy instead of their medical

25  judgment in denying lumbar fusion revision surgery.  In fact, Defendants submit evidence that of

26  the RFS orders to have been presented to the SMART Committee since 2019, 65% of the

27  requests have been approved.  (Song Decl., at ¶ 50.)  Thus, unlike Colwell, this is not a case

28  where the voting SMART Committee members enforced an administrative or de facto policy

32

regarding the medical necessity of fusion revision surgeries.

Furthermore, it is undisputed that CCHCS implemented the mandatory referral requirement to the SMART Committee for lumbar spine surgery due to the high percentage of post-operative complications associated with spinal surgeries.  The CME has no authority to waive this review requirement.  (UF 18.)  The evidence demonstrates that the SMART Committee members reviewed Plaintiff's case, and thoroughly evaluated the risks of surgery against the benefits of her undergoing an extensive spine procedure.  Indeed, Plaintiff acknowledged that the major surgery she requested could result in severe complications and not provide the full pain relief she sought.  (Pl.'s Dep. at 24:23-25:4, 36:21-37:4, 37:21-38:3.)  Thus, based on a review of the relevant factors, including Plaintiff's recent musculoskeletal findings, ability to ambulate, and lack of balance issues, the SMART Committee members reasonably determined that Plaintiff faced substantial risks undergoing the fusion revision surgery, and that more harm than good could result from the surgery.  (Song Decl., at ¶¶ 45-47.)  As such, it was determined that the proposed surgery did not meet the definition of medical necessary under CCHCS policy.[5]  (Feinberg Decl., at ¶ 63.)

Finally, Plaintiff has not demonstrated that Dr. Mitchell was deliberately indifference based on the February 23, 2019 decision to not approve surgery.  It is undisputed that Dr. Mitchell was not a voting member of the MAR Committee on February 23, 2019, and his role in the meeting was simply administrative.  (UF 38.)  Moreover, even if the MAR Committee granted PCP Khoo's appeal regarding the second-level denial of RFS 1406260, Plaintiff's request for surgery would have still be subject to mandatory SMART Committee review.  (UF 37.)  Further, although the RFS 1406260 did not meet InterQual criteria, the MAR Committee did not vote to deny surgery simply because Plaintiff's screw wasn't falling out or based on the application of an improper policy.  (Mitchell Decl., at ¶ 27.)  Rather, the MAR Committee

---

[5] The Court notes that a subsequent neurosurgeon, Dr. Segal, did not recommend lumber fusion revision surgery for Plaintiff's condition in November 2020.  (Mitchell Decl., at ¶ 40.)  Rather, over a year later, Dr. Segal "suspected" non-union at L5-S1 and recommended that Plaintiff undergo surgery to inspect the fusion and remove the hardware. (Id.)  Thus, Dr. Segal did not concur with Dr. Senegor and Dr. Taggard's recommendations for surgery, negating the finding that on October 1, 2019, the SMART Committee deemed a "well-accepted" course of treatment not necessary.

1  reviewed Plaintiff's medical file, and denied surgery (subject to a second opinion) because
2  Plaintiff's imaging studies did not suggest any conclusive evidence of hardware failure or failed
3  fusion, Plaintiff had no worsening of function or neutral compromise, repeat back surgery for
4  pain relief had a poor success rate, and the risks of complications outweighed the benefits of the
5  requested surgery.  (UF 42.)  Consequently, the denial does not provide a basis to impute liability
6  to Dr. Mitchell.

7           **b.     Medical Malpractice**

8           Plaintiff also brings a claim for state law medical malpractice against Defendants Dr.
9  Mitchell and Dr. Song, relating to the denial of lumbar fusion revision surgery.

10          Under California law, "[t]he elements of a medical malpractice claim are (1) the duty of
11  the professional to use such skill, prudence, and diligence as other members of his profession
12  commonly possess and exercise; (2) a breach of that duty; (3) a proximate causal connection
13  between the negligent conduct and resulting injury; and (4) actual loss or damage resulting from
14  the professional's negligence."  Avivi v. Centro Medico Urgente Medical Center, 159
15  Cal.App.4th at 468, n.2 (internal quotations and citation omitted); Johnson v. Superior Court,
16  143 Cal.App.4th 297, 305 (2006).

17          California law requires that plaintiff submit expert medical evidence to support a medical
18  malpractice claim, unless the negligence is obvious to a layperson. Johnson v. Superior Court,
19  143 Cal. App. 4th at 305. "Whenever the plaintiff claims negligence in the medical context, the
20  plaintiff must present evidence from an expert that the defendant breached his or her duty to the
21  plaintiff and that the breach caused the injury to the plaintiff." Powell v. Kleinman, 151 Cal.
22  App. 4th at 123. California law requires causation to "be proven within a reasonable medical
23  probability based on competent expert testimony." Jones v. Ortho Pharm. Corp., 163 Cal. App.
24  3d at 402. Therefore, "expert testimony [is] essential to prove causation," and without such
25  expert testimony, "plaintiff fail[s] to meet his burden on an essential element of the cause of
26  action." Gotschall v. Daley, 96 Cal. App. 4th at 484. Under Rule 56, because plaintiff failed to
27  show required elements for medical malpractice (through expert evidence of breach and
28  causation), defendants are entitled to summary judgment on plaintiff's state law claim as well.

See Gonzalez v. United States, No. 19-16935, 2022 WL 1658224, at *1 (9th Cir. May 25, 2022) (affirming grant of summary judgment in favor of defendant because plaintiff failed to submit expert medical evidence to support medical malpractice claim); Woodward v. United States, No. 2:13-cv-00048-MCE-EFB, 2016 WL 5159589, at *8 (E.D. Cal. 2016) (granting summary judgment "because a medical malpractice claim without the required expert testimony concerning standard of care presents no factual issues for trial).

Plaintiff has failed to demonstrate that either Defendant breached a duty owed to her. Initially, neither Dr. Mitchell nor Dr. Song personally voted to deny Plaintiff's request for surgery on October 1, 2019. (UF 20, 56.) Furthermore, the record negates a finding of medical malpractice. Defendants have presented evidence that some of Plaintiff's imaging studies did not provide clinical evidence of non-union, and the x-rays contradicted the clinical impressions at times. (Song Decl., at ¶¶ 34, 45.) Dr. Feinberg's provides expert opinion that the decision to deny a second back surgery was medically acceptable under the circumstances. (Feinberg Decl., at ¶¶ 62, 63.) Plaintiff has failed to present competent evidence to contract Dr. Feinberg's opinion, other than her own lay opinion. Accordingly, summary judgment should be granted in favor of Defendants on Plaintiff's malpractice claim.[6]

### 2. Pain Management

Plaintiff also claims Dr. Mitchell acted with deliberate indifference to her chronic lower back pain by revoking her gabapentin prescription and denying her all opioid medication on December 27, 2019. More specifically, Plaintiff contends that Dr. Mitchell discontinued Plaintiff's gabapentin on August 1, 2019, with little consideration for an alternative.

### a. Discontinuance of Gabapentin

Despite Plaintiff's claim, Dr. Mitchell declares that he was not involved in the tapering decision, which began on August 22, 2019. (Mitchell Decl., at ¶ 57; Feinberg Decl., at ¶ 60.) PCP Khoo began the tapering schedule in response to the Gabapentin Memo, which Dr. Mitchell did not draft. (Mitchell Decl., at ¶¶ 52, 53.) Although Dr. Mitchell implemented the Gabapentin

---

[6] Notwithstanding this finding, based on the recommendation that summary judgment be granted on all of Plaintiff's federal claims, the Court declines pendant state law jurisdiction over Plaintiff's medical malpractice claims.

1  Memo as the CME at CCWF, the Memo provided medical providers with discretion to continue

2  its off-label use if clinically appropriate.  (Feinberg Decl., at ¶ 43.)  Thus, it is undisputed that

3  Dr. Mitchell did not personally direct Plaintiff's gabapentin taper in response to the Gabapentin

4  Memo, and cannot be held liable based on his supervisory status.  Moreover, Plaintiff was

5  provided with other pain management, such as continued use of Celebrex, supplementation of

6  lidocaine patches, capsaicin cream, and Lyric, which belies Plaintiff's claim she was denied all

7  pain medication for neuropathic and chronic back pain.

8       In addition, Plaintiff's disagreement with the discontinuation of her gabapentin is simply

9  a difference of opinion as to her preferred course of treatment.  Indeed, gabapentin is FDA

10  approved for partial seizures and postherpetic neuralgia-neither of which Plaintiff have.  Further,

11  the Court does not find the CCHCS gabapentin policy to be unconstitutional. While it is true that

12  Courts within the Ninth Circuit have ruled that "[a] medication policy is unconstitutional when it

13  is '[a] blanket policy denying narcotic pain medication to inmates in the general population

14  regardless of medical need," on its face, the CCHCS policy in question is not such a policy.

15  Quigg v. Linder, No. CV1700035GFBMMJTJ, 2020 WL 7647372, at *8 (D. Mont. Nov. 24,

16  2020) (quoting Franklin v. Dudley, No. 2:07-CV-2259 FCD KJN, 2010 WL 5477693, at *7

17  (E.D. Cal. Dec. 29, 2010).   The CCHCS gabapentin policy did not deny inmates access to

18  gabapentin regardless of medical need.  Rather, it "urge[d] health care providers to limit

19  prescribing gabapentin to its FDA-approved indications as clinically appropriate." (Feinberg

20  Decl., at ¶ 60.)   This gave doctors the discretion to continue to prescribe gabapentin for

21  indications other than the FDA-approved indications of partial seizures and postherpetic

22  neuralgia. Plaintiff brings forth no evidence to contradict this plain reading of the policy. Thus,

23  the CCHCS gabapentin policy was not an unconstitutional blanket prohibition on inmates' use of

24  gabapentin. See Quigg, 2020 WL 7647372, at *9.  Accordingly, Dr. Mitchell, as one of PCP

25  Khoo's supervisor, was not deliberately indifferent to Plaintiff's pain when she was tapered off

26  gabapentin and provided other alternative treatment options over the period of several months.

27  ///

28  ///

1

### b. Denial of Opioid Medication

2      Plaintiff's claim that Dr. Mitchell was deliberately indifferent by refusing her opioid

3 medication for breakthrough pain is unsupported by the record.  It is without question that

4 inmates do not have a constitutional right to choice of treatment.  <u>Forbes v. Edgar</u>, 112 F.3d 262,

5 267 (7th Cir. 1997).  In addition, medical treatment, both within and without of prison, does not

6 guarantee a pain-free life.  <u>See, e.g.</u>, <u>Oden v. Cambra</u>, No. C 97-3898 SI (PR), 1999 WL 183611,

7 at *11 (N.D. Cal. Mar. 30, 1999) ("doctors (inside and outside of prisons) are not guarantors of

8 pain-free living for their patients).

9      Defendants submit evidence that on October 25, 2019, Dr. Taylor prescribed 50 mg of

10 tramadol, as needed for breakthrough pain, for one week.  (Feinberg Decl., at ¶ 54.)  On

11 November 7, 2019, Plaintiff requested that the tramadol be extended "as long as possible."

12 (Feinberg Decl., at ¶ 55.)  On December 27, 2019, PCP Khoo presented Plaintiff's request for

13 tramadol to the Pain Management Committee.  (Mitchell Decl., at ¶ 52, Ex. I.)  Dr. Mitchell was

14 present at the Pain Management Committee in his administrative capacity as CME.  (Mitchell

15 Decl., at ¶ 52.)   The Pain Management Committee considered various factors, including

16 Plaintiff's complaint of neck pain, knee pain, and worsening low back pain.  (<u>Id.</u>)  It was also

17 noted that surgery was denied and her plates remained in place following the January 2018

18 lumbar surgery.  (<u>Id.</u>)  Upon consideration, it was determined that the evidence did not support

19 the long-term use of opioids in Plaintiff's case.  (<u>Id.</u>; Feinberg Decl., at ¶ 57.)  Dr. Feinberg

20 opines that "[c]urrent medical best practices disfavor the use of opioids for chronic non-cancer

21 pain, so as to minimize the risks of opioid dependence, addiction, and overdose.  (Feinberg

22 Decl., at ¶ 61.)  Dr. Feinberg further opined that "[g]iven that Plaintiff was at high risk of adverse

23 outcomes for opioid-related harm, it was medically acceptable to deny her long-term request for

24 morphine and/or tramadol in favor of other pharmacological and non-pharmacological

25 approaches for chronic back pain."  (<u>Id.</u>)   Plaintiff has presented no evidence to the contrary.  In

26 addition, Plaintiff was treated with Celebrex, lidocaine patches, and Lyrica and there is no expert

27 opinion that such medication was ineffective for treating her back pain.  (Feinberg Decl., at ¶¶

28 59, 60.)  Accordingly, based on the evidence in the record, the Pain Management Committee's

1  decision to deny long-term request for tramadol was medically acceptable.  Thus, even if Dr.

2  Mitchell had input (which he did not) into the decision to take Plaintiff off opioids, such decision

3  does not demonstrate deliberate indifference.[7]

4           3.       Request for Prospective Injunctive Relief

5           Plaintiff brings a claim against Dr. Ola, in his official capacity as the current CME of

6  CCWF, for prospective injunctive relief.

7           It is undisputed that Defendant Dr. Mitchell resigned from CCWF and has since been

8  replaced by the current CME, Dr. Ola.  (Ola Decl., at ¶ 9.11.)  Plaintiff seeks an order directing

9  the performance of lumbar fusion revision surgery by a physician of her chose.  (ECF No. 105.)

10 However, it is undisputed that all requests for non-emergent lumbar spine surgeries must be

11 approved by the SMART Committee.  (UF 17.)  Dr. Ola is not a member of the SMART

12 Committee, and does not have the authority to implement the relief Plaintiff seeks.  (Ola Decl., at

13 ¶¶ 6, 8, 9.)  Accordingly, the Court cannot grant Plaintiff's request for injunctive relief.

14                                    **IV.**

15                         **RECOMMENDATIONS**

16        Based on the foregoing, it is HEREBY RECOMMENDED that:

17        1.        Plaintiff's motions filed on November 10, 2022 (ECF Nos. 136, 137, 138, 139,

18                  140) be denied;

19        2.        Plaintiff's motion for summary judgment (ECF No. 105) be denied; and

20        3.        Defendants' motion for summary judgment (ECF No. 125) be granted.

21        These Findings and Recommendations will be submitted to the United States District

22 Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within **twenty-**

23 **one (21) days** after being served with these Findings and Recommendations, the parties may file

24 written objections with the Court.  The document should be captioned "Objections to Magistrate

25 Judge's Findings and Recommendations."  The parties are advised that failure to file objections

26 within the specified time may result in the waiver of rights on appeal.  Wilkerson v. Wheeler,

27 _____

28 [7] Because the Court finds Defendants are entitled to summary judgment on the merits of Plaintiff's claims, the Court
need not reach the alternative argument for qualified immunity.

772 F.3d 834, 838-39 (9th Cir. 2014) (citing <u>Baxter v. Sullivan</u>, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **June 23, 2023**

UNITED STATES MAGISTRATE JUDGE